Kristen Lake Cardoso (SBN 338762)
**KOPELOWITZ OSTROW P.A.**
One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
cardoso@kolawyers.com

*Counsel for Plaintiff and the Putative Class*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JENNIFER TRUJILLO, on behalf of her minor child A.T., and all others similarly situated,

Plaintiff,

v.

DOCTUSUSA INC.,

Defendant.

No.

**CLASS ACTION COMPLAINT**

1. **Negligence/Negligence P*er Se***
2. **Breach of Third-Party Beneficiary Contract**
3. **Declaratory Judgment**

**DEMAND FOR JURY TRIAL**

Plaintiff, Jennifer Trujillo, on behalf of her minor child A.T. ("Plaintiff"), and all others similarly situated, alleges the following Class Action Complaint (the "Action") against Defendant DoctusUSA Inc. ("Defendant") upon personal knowledge as to herself and her own actions, and upon information and belief, including the investigation of counsel as follows:

## I. INTRODUCTION

1. Plaintiff seeks monetary damages and injunctive and declaratory relief for injuries arising from Defendant's failure to safeguard the Personally Identifiable Information[1] ("PII") and Protected Health Information ("PHI") (together, "Private Information") of Plaintiff and Class members from unauthorized access to its information systems and the compromise and unauthorized disclosure of that Private Information, causing widespread injury and damages to Plaintiff and the proposed Class (defined below) members.

2. Defendant provides medical coding and revenue cycle management services to numerous clients ("Defendant's Clients" or "Clients").[2] In order to obtain medical services from Defendant's Clients, former and current patients of the Clients are required to entrust Defendant with Private Information, without which Defendant could not perform its regular business activities. Defendant is fully aware of the sensitivity of the information that it collects and its obligation to maintain that information as confidential and safe from unauthorized access.

3. Upon information and belief, the Private Information that the intruders targeted, accessed, and exfiltrated from Defendant's systems included the Private

[1] The Federal Trade Commission ("FTC") defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."17 C.F.R. § 248.201(b)(8). To be clear, according to Defendant, not every type of information included in that definition was compromised in the subject data breach.

[2] https://www.doctususa.com/ (last accessed July 16, 2026)

Information Plaintiff and Class members indirectly provided to Defendant in connection with the services it provides.

4. As explained in detail herein, recently, notorious cybercriminal group "DeadLock" claimed responsibility for a cyber-attack against Defendant ("Data Breach").[3]

5. DeadLock is a notorious cybercriminal extortion group that engages in data theft and ransom schemes, including threatening to leak stolen sensitive information to coerce payment from victims.[4]

6. Defendant's failure to safeguard the sensitive Private Information Plaintiff and Class members indirectly entrusted to it violates its common law duty, industry standards, and Defendant's third-party beneficiary contracts with its Clients to safeguard the Private Information Plaintiff and Class members provided to Defendant.

7. Defendant could have prevented this Data Breach by implementing reasonable, expected, and industry standard data security measures. Instead, Defendant disregarded the rights of Plaintiff and Class members by intentionally, willfully, recklessly, and/or negligently failing to implement these measures to safeguard the Private Information Plaintiff and Class members indirectly provided to Defendant, and by failing to take necessary steps to prevent unauthorized disclosure of that information. Defendant's woefully inadequate data security measures made the Data Breach a foreseeable, and even likely, consequence of its negligence.

8. Plaintiff and Class members would not have indirectly provided their valuable Private Information to Defendant or entrusted the Private Information to Defendant's Clients had they known that Defendant would, *inter alia*, make their Private Information Internet-accessible, not encrypt personal and sensitive data elements and not delete the Private Information it no longer had reason to maintain.

---

[3] https://www.group-ib.com/blog/deadlock-ransomware-polygon-smart-contracts/ (last accessed July 16, 2026).

[4] *Id.*

9. Plaintiff and Class members now face a lifetime risk of identity theft due to the nature of the information lost, which they cannot change, and which cannot be made private again.

10. Defendant's harmful conduct has injured Plaintiff and Class members in multiple ways, including: (i) the lost or diminished value of their Private Information; (ii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iii) lost opportunity costs to mitigate the Data Breach's consequences, including lost time; and (iv) emotional distress associated with the loss of control over their highly sensitive Private Information.

11. Upon information and belief, Plaintiff's Private Information is available on the dark web as a result of the Data Breach.

12. Plaintiff brings causes of action against Defendant for negligence, breach of third-party beneficiary contract, and declaratory judgment, seeking an award of monetary damages and injunctive and declaratory relief, resulting from Defendant's failure to adequately protect their highly sensitive Private Information.

## II. JURISDICTION AND VENUE

13. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is over 100, and at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

14. This Court has personal jurisdiction over Defendant because it has its principal place of business in California, and does a significant amount of business in California.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant has its principal place of business located in this District, and a substantial part of the events giving rise to this action occurred in this District.

## III. PARTIES

16. Plaintiff is, and at all times mentioned herein was, an individual resident and citizen of the State of Texas.

17. Defendant is a corporation with its headquarters and principal place of business at 2010 El Camino Real # 1351, Santa Clara, CA 95050.

## IV. FACTUAL ALLEGATIONS

***Defendant's Business***

18. Defendant provides medical coding and revenue cycle management services to numerous clients.[5]

19. Plaintiff and Class members indirectly provided Defendant with their Private Information to receive services from Defendant's Clients.

20. As a necessary part of utilizing Defendant's services, Defendant's healthcare provider Clients and their patients grant Defendant access to and control over patient data, including non-public, sensitive Private Information.

21. The information held by Defendant at the time of the Data Breach included the unencrypted Private Information provided to it indirectly by Plaintiff and Class members.

22. Upon information and belief, Defendant at all times relevant to this action maintained a privacy policy directed to the patients of its Clients,[6] including Plaintiff and Class members, that made promises and representations that the Private Information collected would be kept safe and confidential, the privacy of that information would be maintained, and Defendant would delete any sensitive information after it was no longer required to maintain it.

---

[5] https://www.doctususa.com/about (last accessed July 16, 2026)

[6] https://www.doctususa.com/hipaa (last visited July 16, 2026).

23. Plaintiff and Class members indirectly provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

24. Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class members from involuntary disclosure to third parties. Defendant has a legal duty to keep the Private Information that Plaintiff and Class members indirectly provided to it safe and confidential.

25. On information and belief, Defendant had uniform contracts with all healthcare provider Clients, including Plaintiff's and Class members' healthcare providers, requiring Defendant to adequately protect the patient Private Information it collected through industry standard and HIPAA-compliant measures.

26. Defendant had obligations under the FTC Act, HIPAA, contract, and industry standards to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

27. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class members.

28. Defendant owed a duty to Plaintiff and Class members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others

who accessed Private Information within its computer systems on how to adequately protect Private Information.

29. Defendant owed a duty to Plaintiff and Class members to implement processes that would detect a compromise of Private Information in a timely manner.

30. Defendant owed a duty to Plaintiff and Class members to act upon data security warnings and alerts in a timely fashion.

31. Defendant owed a duty to Plaintiff and Class members to disclose in a timely and accurate manner when and how the Data Breach occurred.

32. Defendant owed a duty of care to Plaintiff and Class members because they were foreseeable and probable victims of any inadequate data security practices.

33. Defendant derived a substantial economic benefit from collecting Plaintiff's and Class members' Private Information. Without the required submission of Private Information to its Clients by Plaintiff and Class members, Defendant could not perform the services it provides.

34. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' Private Information from disclosure.

***The Attack and Data Breach***

35. Recently, notorious cybercriminal group "DeadLock" claimed responsibility for a cyber attack against Defendant.[7]

36. DeadLock is a notorious cybercriminal extortion group that engages in data theft and ransom schemes, including threatening to leak stolen sensitive information to coerce payment from victims.[8]

[7] https://www.breachsense.com/breaches/doctus-usa-data-breach/ (last visited July 16, 2026).
[8] https://www.group-ib.com/blog/deadlock-ransomware-polygon-smart-contracts/ (last visited July 16, 2026).

37. Upon information and belief, and because of the nature of Defendant's business, the Private Information that the intruders targeted, accessed, and exfiltrated from Defendant's systems included the Private Information Plaintiff and Class members indirectly provided to Defendant in connection with the services it provides.

38. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

39. As a result, the attacker accessed, acquired and viewed files in Defendant's computer systems containing unencrypted Private Information indirectly provided to it by Plaintiff and Class members. The Private Information indirectly provided to Defendant by Plaintiff and Class members was accessed and stolen in the Data Breach.

40. Plaintiff further believes her Private Information, and that of Class members, was subsequently viewed and sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals like DeadLock that commit cyber-attacks of this type.

***Defendant Failed to Comply with FTC Guidelines and Industry Standards***

41. Federal and state regulators have established security standards and issued recommendations to prevent data breaches and the resulting harm to consumers. There are a number of state and federal laws, requirements, and industry standards governing the protection of Private Information.

42. The Federal Trade Commission ("FTC") has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be considered for all business decision-making.[9]

[9] *Start With Security*, Fed. Trade Comm'n ("FTC"), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited July 16, 2026).

43. Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[10]

44. The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

45. The FTC advises companies to not keep information for periods of time longer than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[11]

46. The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice barred by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

47. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

48. Defendant's failure to verify that it had implemented reasonable security measures constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

[10] *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited July 16, 2026).
[11] *Id.*

49. Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and proposes solutions to defend against those cyber-attacks.[12] All organizations collecting and handling Private Information, such as Defendant, are strongly encouraged to follow these controls.

50. Additionally, cybersecurity firms have promulgated a series of best practices that at a minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting of physical security systems; protecting against any possible communication system; and training staff regarding critical points.[13]

51. Other best practices include but are not limited to securely configuring business software, managing access controls and vulnerabilities to networks, systems, and software, maintaining network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, limiting access to sensitive information to only necessary employees, and securing application software.[14]

52. The following frameworks incorporate these data security measures and others and are regularly employed as industry standard practices: the NIST Cybersecurity Framework 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06,

[12] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited July 16, 2026).
[13] *See Addressing BPO Information Security: A Three-Front Approach*, DATAMARK, INC. (Nov. 2016), https://insights.datamark.net/addressing-bpo-information-security (last visited July 16, 2026).
[14] *See* Center for Internet Security, *Critical Security Controls* (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited July 16, 2026).

DE.CM-09, and RS.CO-04), NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

53. Defendant failed to follow these and other industry standards to adequately protect the Private Information of Plaintiff and Class members.

***Defendant Failed to Comply with HIPAA***

54. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep individuals' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[15]

55. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI is properly maintained.[16]

56. The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

---

[15] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[16] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

b. failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

57. Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations.

***Data Breaches are Preventable***

58. Data breaches are preventable.[17] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[18] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[19]

59. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. Data breaches have been on the rise for several years. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1,400 percentage points. The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

60. In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[20]

---

[17] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.

[18] *Id.* at 17.

[19] *Id.* at 28.

[20] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/ (last visited July 16, 2026).

61. In 2024, these numbers held steady - a record 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records (i.e., a 211% increase year over year).[21] Entities storing healthcare data were the second most targeted entities in 2024, behind only financial services companies, but had previously been the most targeted companies from 2018 to 2023.[22]

62. In light of recent high profile cybersecurity incidents at other companies in possession of healthcare data, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), BJC Health System (286,876 patients, March 2020) and 23andMe., Inc. (20 million records, October 2023), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

63. Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

64. Additionally, as companies became more dependent on computer systems to run their business,[23] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[24]

---

[21] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

[22] *Id.*

[23] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html

[24] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

65. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class members from being compromised.

66. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information provided to it by Plaintiff and Class members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class members as a result of a breach.

67. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

68. The injuries to Plaintiff and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class members.

69. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class members are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

70. As a healthcare entity in possession of Plaintiff's and Class members' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information indirectly entrusted to it by Plaintiff and Class members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

***The Data Breach Increases Plaintiff's and Class members' Risk of Identity Theft***

71. The unencrypted Private Information of Plaintiff and Class members will end up (if it has not already ended up) for sale on the dark web, as that is the *modus operandi* of hackers such as DeadLock.

72. The ramifications of Defendant's failure to secure the Private Information indirectly provided to it by Plaintiff and Class members are severe. Victims of data breaches are much more likely to become victims of identity theft and other types of fraudulent schemes.

73. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[25] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[26]

74. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[27] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[28] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[29]

---

[25] 17 C.F.R. § 248.201 (2013).
[26] *Id.*
[27] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.
[28] *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.
[29] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

75. When the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [Private Information] belonging to victims from countries all over the world. One of the key challenges of protecting Private Information online is its pervasiveness. As data breaches in the news continue to show, Private Information about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[30]

76. Identity thieves can use the Private Information that Defendant failed to keep secure to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud, such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

77. Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[31]

78. As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a person's name, DOB, Social Security and insurance numbers, and even financial

---

[30] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, https://www.armor.com/resources/blog/stolen-pii- ramifications- identity-theft-fraud-dark-web/ (last visited July 16, 2026).

[31] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[32] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[33]

79. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data to open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[34]

80. The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online."[35]

---

[32] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[33] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings from The Global State of Information Security® Survey 2015: https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

[34] Experian, Healthcare Data Breach: What to Know About them and What to Do After One: https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[35] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

81. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[36]

82. Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to target them with spam emails or solicitations to deceive the victim into providing the criminal with additional personal information.

83. Phishing scammers use emails and text messages to trick people into giving them their personal information, including but not limited to passwords, account numbers, and social security numbers. Phishing scams are frequently successful, and the FBI reported that people lost approximately $18.7 million to such scams in 2023 alone.[37]

84. Accordingly, providing credit monitoring or reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. Javelin Research reported that "[f]raud-related resolution hours skyrocketed in 2023. The average amount of time consumers spent in 2022 resolving issues stemming from identity fraud clocked in at six hours, but in 2023, fraud

---

[36] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf.

[37] *Internet Crime Report*, FEDERAL BUREAU OF INVESTIGATION, (2023), https://www.ic3.gov/annualreport/reports/2023_ic3report.pdf scams (Last visited July 17, 2026).

resolution hours rose steeply, jumping to a nearly 10-hour average, a major disruption for consumers and financial institutions alike."[38]

85. Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting credit bureaus to place a fraud alert, reviewing their credit reports, placing a credit freeze on their credit, and correcting their credit reports.[39] The result is that Plaintiff and Class members are forced to spend their own personal time, or take time from work, to respond to the Data Breach and Defendant has not offered to compensate them for this loss of time.

86. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

87. Because the information stolen in the Data Breach is immutable and cannot be changed, it can be used to perpetrate fraud and identity theft for the remainder of their lives. Plaintiff and Class members now face years of constant surveillance of their financial and medical records, monitoring, and loss of rights.

88. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class members.

89. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class members because of the Data Breach.

---

[38] *Javelin Strategy & Research, 2024 Identity Fraud Study: Resolving the Shattered Identity Crisis* (2024), available at https://javelinstrategy.com/research/2024-identity-fraud-study-resolving-shattered-identity-crisis.

[39] *See* https://www.identitytheft.gov/Steps.

90. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

91. The Private Information Plaintiff and Class members indirectly provided to Defendant is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class members and to profit from their misfortune.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

92. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

93. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class members must monitor their financial accounts for many years to mitigate the risk of identity theft.

94. Plaintiff and Class members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

95. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO

Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[40]

96. Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[41]

97. And for those Class members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

***Diminution of Value of Private Information***

98. Private Information is valuable property.[42] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

99. The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future

---

[40] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last accessed July 16, 2026).

[41] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last accessed July 16, 2026).

[42] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last accessed July 16, 2026) ("GAO Report").

harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult, if not impossible, to change.

100. This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[43]

101. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[44]

102. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[45] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[46,47] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[48]

103. As a result of the Data Breach, the Private Information Plaintiff and Class members indirectly provided to Defendant, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any

---

[43] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed July 16, 2026).

[44] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[45] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed July 16, 2026).

[46] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last accessed July 16, 2026).

[47] https://datacoup.com/ (last accessed July 16, 2026).

[48]https://www.thepennyhoarder.com/make-money/nielsenpanel/#:~:text=Sign%20up%20to%20join%20the,software%20installed%20on%20your%20computer (last accessed July 16, 2026).

consideration paid to Plaintiff or Class members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

104. The fraudulent activity resulting from the Data Breach may not come to light for years.

105. Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

106. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to thousands of individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

107. The injuries to Plaintiff and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class members.

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

108. Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in this Data Breach, and the sensitive type of Private Information involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

109. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

110. Consequently, Plaintiff and Class members are at an increased risk of fraud and identity theft for many years into the future.

111. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class member. This is a reasonable and necessary cost to monitor and protect Class members from the risk of identity theft resulting from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class members would not need to bear, but for Defendant's failure to safeguard their Private Information.

***Loss of the Benefit of the Bargain***

112. Furthermore, Defendant's poor data security deprived Plaintiff and Class members of the benefit of their bargain. When seeking healthcare services from Defendant's Clients, Plaintiff and other reasonable individuals understood and expected that a portion of the amounts paid for those services with Defendant's Clients would be devoted to necessary data security to protect the Private Information, and in turn that a portion of the amounts Defendant's Clients paid to Defendant for its services would be devoted to necessary data security to protect the Private Information, when, in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant's Clients.

***Plaintiff's Experience***

113. Plaintiff is a patient of one of Defendant's Clients. Plaintiff was required to provide her Private Information to a client of Defendant, as a condition of receiving medical services, who in turn entrusted the Private Information to Defendant.

114. Upon information and belief, at the time of the Data Breach, Defendant retained the Private Information Plaintiff indirectly provided to Defendant in its system.

115. Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

116. Upon information and belief, Plaintiff's Private Information was improperly accessed and obtained by unauthorized third parties.

117. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach. Plaintiff has spent significant time dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

118. As a result of the Data Breach, Plaintiff fears for her personal financial security and uncertainty over what medical information was revealed in the Data Breach. She is experiencing feelings of anxiety, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

119. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

120. As a result of the Data Breach, Plaintiff is presently at risk and will continue to be at increased risk of identity theft and fraud for years to come.

121. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## V. CLASS ACTION ALLEGATIONS

122. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), on behalf of a class defined as:

> All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach (the "Class").

123. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

124. Plaintiff reserves the right to amend the definition of the Class if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

125. <u>Numerosity</u>. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiff and exclusively in the possession of Defendant, upon information and belief, at least hundreds, if not thousands, of individuals were impacted.

126. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure the Private Information Plaintiff and Class members indirectly provided to Defendant from unauthorized access and disclosure;

c. Whether Defendant's computer systems and data security practices used to protect the Private Information Plaintiff and Class members indirectly provided to Defendant violated the FTC Act, HIPAA, industry standards, and/or state laws, and/or Defendant's other duties discussed herein;

d. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class members;

e. Whether Defendant unlawfully shared, lost, or disclosed the Private Information Plaintiff and Class members indirectly provided to Defendant;

f. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Plaintiff and Class members suffered injury as a proximate result of Defendant's negligent actions or failures to act;

h. Whether Defendant failed to exercise reasonable care to secure and safeguard the Private Information Plaintiff and Class members indirectly provided to Defendant;

i. Whether Defendant breached duties to protect the Private

Information Plaintiff and Class members indirectly provided to Defendant;

j. Whether Defendant's actions and inactions alleged herein were negligent;

k. Whether Defendant was unjustly enriched by its conduct as alleged herein;

l. Whether Plaintiff and Class members were parties to contracts between Defendant and its clients, pursuant to which Defendant was required to protect Plaintiff's and Class members' Private Information and privacy, and whether that contract was breached;

m. Whether Plaintiff and Class members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

n. Whether Plaintiff and Class members are entitled to additional credit or identity monitoring and monetary relief; and

o. Whether Plaintiff and Class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

127. Typicality. Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

128. Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class members uniformly and Plaintiff's

challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

129. Adequacy. Plaintiff will fairly and adequately represent and protect the interests of the Class members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Class members. Plaintiff seeks no relief that is antagonistic or adverse to the Class members and the infringement of the rights and the damages she has suffered are typical of other Class members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

130. Superiority and Manageability. The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

131. The nature of this action and the nature of laws available to Plaintiff and Class members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the

Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

132. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

133. Adequate notice can be given to Class members directly using information maintained in Defendant's records.

134. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class members, Defendant may continue to refuse to provide proper notification to Class members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

135. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

136. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant failed to timely notify the Plaintiff and the class of the Data Breach.

b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding the Private Information Plaintiff and Class members indirectly provided to Defendant.

c. Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts.

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence.

e. Whether Defendant failed to take commercially reasonable steps to safeguard individuals' Private Information; and,

f. Whether adherence to FTC and HIPAA data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## VI. CAUSES OF ACTION

**COUNT I**
**NEGLIGENCE/NEGLIGENCE *PER SE***
**(On behalf of Plaintiff and All Class members)**

137. Plaintiff restates and realleges paragraphs 1 through 136 above as if fully set forth herein.

138. Plaintiff and Class members are required to indirectly submit non-public Private Information to Defendant as a condition of receiving healthcare services from Defendant's Clients.

139. Defendant gathered and stored the Private Information of Plaintiff and Class members as part of its business.

140. Plaintiff and Class members indirectly entrusted Defendant with their Private Information with the understanding that Defendant would safeguard the information.

141. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class members could and would suffer if the Private Information were wrongfully disclosed.

142. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class

members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

143. Defendant owed a duty of care to Plaintiff and Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

144. Defendant had duties arising under the FTC Act to protect the Private Information Plaintiff and Class members indirectly provided to Defendant.

145. Defendant had duties arising under HIPAA to protect the Private Information Plaintiff and Class members indirectly provided to Defendant.

146. Defendant's violations of Section 5 of the FTC Act, HIPAA, and similar state statutes constitute negligence *per se*.

147. Plaintiff and Class members are within the class of persons that these statutes were intended to protect and the harm that has occurred is the type of harm these statutes were intended to guard against.

148. In addition, under state data security and consumer protection statutes such as those outlined herein, Defendant had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and Class members' Private Information.

149. Plaintiff and Class members were foreseeable victims of Defendant's violations of the FTC Act, HIPAA, and state data security and consumer protection statutes. Defendant knew or should have known that its failure to implement reasonable data security measures to protect and safeguard the Private Information Plaintiff and

Class members indirectly provided to Defendant would cause damage to Plaintiff and the Class.

150. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described herein, but also because Defendant is bound by industry standards to protect confidential Private Information. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain pursuant to regulations.

151. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

152. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and the Class members. That special relationship arose because Plaintiff and Class members entrusted Defendant's Clients with their confidential Private Information, a necessary part of obtaining services from Defendant's Clients, and then Defendant's Clients entrusted the confidential Private Information to Defendant.

153. California Courts analyze six factors to determine the existence of a special relationship with no single factor being required or dispositive: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm.

154. Here, each factor is satisfied as (1) the transactions in which Plaintiff indirectly provided her Private Information to Defendant were for the purpose of receiving healthcare services from Defendant's Clients; (2) data breaches targeting Private Information are readily foreseeable and the subject of frequent warnings by data security experts and state and federal governments; (3) the injuries associated with the theft and misuse of the Private Information, including the expenditure of time and money mitigating the consequences of a data breach are alleged by Plaintiff; (4) the theft of Private Information and Plaintiff's allegations that Defendant failed to implement reasonable data security measures is logically connected to and proximately caused by the Data Breach; (5) the moral blame associated with Defendant's collection and use of Plaintiff's Private Information for its own profit while failing to fund data security measures intended to protect Plaintiff's Private Information from the foreseeable consequences of a data breach is high; and (6) imposing liability on Defendant for failing to safeguard Private Information will further the state policy of ensuring that personal information is protected and preventing the theft and misuse of Private Information by criminals.

155. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

156. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

157. Defendant breached its duties, thus was negligent, by failing to use reasonable measures to protect Class members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, (a) failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information; (b) failing to adequately monitor the security of

its networks and systems; and (c) allowing unauthorized access to Class members' Private Information.

158. A breach of security, unauthorized access, and resulting injury to Plaintiff and Class members was reasonably foreseeable, particularly considering Defendant's inadequate security practices.

159. It was foreseeable that Defendant's failure to use reasonable measures to protect Class members' Private Information would result in injury to Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

160. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class members could and would suffer if the Private Information were wrongfully disclosed.

161. Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information indirectly provided to it by Plaintiff and Class members, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

162. It was therefore foreseeable that the failure to adequately safeguard Class members' Private Information would result in one or more types of injuries to Class members.

163. Plaintiff and Class members had no ability to protect their Private Information that was in, and likely remains in, Defendant's possession.

164. Defendant was in an exclusive position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

165. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and Class members, the Private Information of Plaintiff and Class members would not have been compromised.

166. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and Class members and the harm, or risk of imminent harm, suffered by Plaintiff and Class members. The Private Information of Plaintiff and Class members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

167. As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of their Private Information; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

168. As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

169. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered and will suffer the continued risks of exposure of the Private Information, which remains in Defendant's possession and is

subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

170. Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

171. Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class members.

**COUNT II**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On behalf of Plaintiff and All Class members)**

172. Plaintiff restates and realleges paragraphs 1 through 136 above as if fully set forth herein.

173. Upon information and belief, Defendant entered into uniform written contracts with its clients—Plaintiff's and Class members' healthcare providers—to provide medical services and technology for diagnostic and research purposes.

174. Pursuant to these contracts, Defendant's Clients, including Plaintiff's and Class members' healthcare providers, agreed to provide Defendant with compensation and with Plaintiff's and Class members' Private Information. Defendant received Plaintiff's and Class members' Private Information in the course of furnishing its services under these contracts with Plaintiff's and Class members' healthcare providers.

175. In exchange, Defendant agreed, in part, to implement adequate data security measures to safeguard the Private Information Plaintiff and Class members indirectly entrusted to it from unauthorized disclosure.

176. These contracts between Defendant and its healthcare provider Clients, including Plaintiff's and Class members' healthcare providers, required Defendant to

adequately protect the patient Private Information it collected through industry standard and HIPAA-compliant measures.

177. At all relevant times, Defendant was a party to agreements with its healthcare provider Clients, including Plaintiff's and Class members' healthcare providers, regarding the providers' use of Defendant's services. Upon information and belief, these agreements obligated Defendant to comply with all applicable privacy laws and regulations regarding all PHI collected or received by it.

178. Defendant's agreements with Plaintiff's and Class members' healthcare providers also, upon information and belief, prohibit Defendant from disclosing patient PHI for any purpose not authorized under the agreements.

179. Defendant was required by statute and regulation, including but not limited to HIPAA and state consumer privacy and protection laws, to have contracts with Defendant's healthcare provider Clients, including Plaintiff's and Class members' healthcare providers, obligating Defendant to implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' Private Information from unauthorized access, use, or disclosure.

180. To that end, any agreements and contracts made by Defendant with its healthcare provider clients uniformly mandate Defendant to comply with all applicable HIPAA requirements for all PHI it collects, and prohibit Defendant from disclosing PHI for any purpose not authorized under the parties' agreement.

181. The relevant statutes and regulations obligating Defendant to be required by contract to use reasonable data security for Plaintiff's and Class members' Private Information create a class of intended beneficiaries whose members are implied into such agreements by operation of law. Plaintiff and Class members are the intended beneficiaries of the contracts that Defendant entered into with Plaintiff's and Class members' healthcare providers to satisfy these statutory and regulatory requirements.

182. These contracts between Defendant and Plaintiff's and Class members' healthcare providers were made for the specific purpose of using Defendant's services for the benefit of Plaintiff and Class members, and as such, the foregoing terms requiring Defendant's sufficient security and confidentiality for patient data were for Plaintiff's and Class members' express benefit as the intended third-party beneficiaries.

183. Defendant knew Plaintiff and Class members were involved and were meant to benefit from the transactions that were subject to these contracts between Defendant and Plaintiff's and Class members' healthcare providers.

184. Defendant knew that if it breached its contractual obligation to adequately safeguard its Clients' patients' Private Information, those patients—including Plaintiff and Class members—would be harmed.

185. Defendant breached these contracts with Plaintiff's and Class members' healthcare providers by, among other acts and omissions, failing to use reasonable data security measures or implement adequate protocols and employee training sufficient to protect Plaintiff's and Class members' Private Information from unauthorized disclosure.

186. As a direct and proximate result of Defendant's breaches of these contracts, Plaintiff and Class members have suffered and will continue to suffer injuries as set forth herein, and are entitled to damages sufficient to compensate for the losses they sustained as a direct result thereof.

**COUNT III**
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

187. Plaintiff restates and realleges paragraphs 1 through 136 above as if fully set forth herein.

188. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties

and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

189. An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendant's common law and other duties to act reasonably with respect to employing reasonable data security. Plaintiff alleges Defendant's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of new or additional fraud against them or on their accounts using the stolen data.

190. Under its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant continues to owe a legal duty to employ reasonable data security to secure the Private Information it possesses, and to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

b. Defendant continues to breach its duty by failing to employ reasonable measures to secure Plaintiff and the Class members' personal and financial information; and

c. Defendant's breach of its legal duty continues to cause harm to Plaintiff and the Class.

191. The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect Plaintiff and the Class members' data.

192. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data systems. If another breach of Defendant's data systems occurs, Plaintiff and the

Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

193. The hardship to Plaintiff and the Class if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued.

194. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of all other similarly situated, and Class members, request judgment against Defendant and that the Court grants the following:

A. For an order certifying the Class, as defined herein, and appointing Plaintiff and her Counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

iii. requiring Defendant to delete, destroy, and purge the Private Information of Plaintiff and Class members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class members;

iv. requiring Defendant to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class members;

v. prohibiting Defendant from maintaining the Private Information of Plaintiff and Class members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and security checks;

xi. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xii. requiring Defendant to meaningfully educate all Class members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves; and

xiii. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct an attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment.

D. For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined by a jury at trial;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury.

**DOCUMENT PRESERVATION DEMAND**

Plaintiff demands that Defendant take affirmative steps to preserve all records, lists, electronic databases, or other itemization of telephone numbers associated with the communications or transmittal of the calls as alleged herein.

Dated: July 17, 2026

Respectfully Submitted,

*<u>/s/ Kristen Lake Cardoso</u>*
Kristen Lake Cardoso (SBN 338762)
**KOPELOWITZ OSTROW P.A.**
One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
cardoso@kolawyers.com

*Counsel for Plaintiff and the Proposed Class*